No. 17-56003

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

---

*Agua Caliente Band of Cahuilla Indians,*

*Plaintiff-Appellant,*

*v.*

*County of Riverside, et al.,*

*Defendants-Appellees, and*

*Desert Water Agency,*

*Intervenor-Defendant-Appellee.*

---

## ON APPEAL FROM THE UNITED STATES DISTRICT
## COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA
## NO. 5:14-CV-00007-DMG-DTB, HON. DOLLY M. GEE

---

## ANSWERING BRIEF OF THE COUNTY OF RIVERSIDE, ET
## AL., DEFENDANTS-APPELLEES

---

Gregory P. Priamos
Ronak N. Patel
COUNTY OF RIVERSIDE
3960 Orange Street
Suite 500
Riverside, California 92501
Telephone: (951) 955-6300
Facsimile: (951) 955-6363
rpatel@co.riverside.ca.us

Jennifer A. MacLean
Benjamin S. Sharp
Meredith Weinberg
PERKINS COIE LLP
700 Thirteenth Street, N.W., Suite 600
Washington, D.C. 20005-3960
Telephone: 202.654.6200
Facsimile: 202.654.6211
JMaclean@perkinscoie.com
BSharp@perkinscoie.com

*Attorneys for Defendants-Appellees*
*County of Riverside, Larry W. Ward, Paul Angulo and Don Kent*

# TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................1

ISSUES PRESENTED FOR REVIEW ................................................2

STATEMENT OF THE CASE..............................................................3

    A.    Procedural Background ..............................................................3

    B.    Statement of Relevant Facts ......................................................6

        1.    California's Property Tax System..............................................6

        2.    The Agua Caliente Reservation .................................................9

            a.    The Tribe's leasing activities........................................10

            b.    The Allottees' leasing activities ...................................10

        3.    Non-Indian lessees rely on services provided by the County and other jurisdictions.................................................12

        4.    Property tax revenues, including the PIT, directly serve the communities that generate them .......................................13

SUMMARY OF THE ARGUMENT ....................................................17

STANDARD OF REVIEW ..................................................................21

ARGUMENT ........................................................................................21

    A.    Section 465 does not preempt the PIT .............................................22

        1.    Section 465 does not apply because the Agua Caliente Reservation was not acquired under that Act .........................22

        2.    Section 465 would not preempt the PIT, even if it applied .....27

            a.    Section 465 prohibits taxation of lands and interests, the title to which the Secretary acquires in trust ........................................................................28

            b.    The legal incidence of the PIT does not fall on the Tribe or Allottees........................................................29

        c.     The Tribe conflates these principles, but cannot cite to a case that supports its position ..........................30

        d.     The Tribe's amici raise new arguments that should be rejected ....................................................................35

B.     The district court correctly concluded that the State' interests fully justify application of the PIT under Bracker balancing ............37

    1.     The State's interests in applying the PIT to lessees of Agua Caliente lands are very strong .......................................38

        a.     The PIT is not a tax on Indian Land, as the Tribe repeatedly suggests ........................................................41

        b.     The Tribe's argument against "general revenue taxes" misconstrues the law and the PIT ......................42

        c.     The law does not require the type of nexus the Tribe claims ..................................................................44

        d.     PIT revenues are tied to specific services and serve the communities that generate them .............................46

    2.     The strong State interests outweigh the federal and tribal interests under Bracker .......................................................49

C.     The PIT does not interfere with Tribal Sovereignty or Self-Governance, for Bracker or other purposes .......................................53

CONCLUSION ......................................................................................57

STATEMENT OF RELATED CASES ...................................................1

CERTIFICATE OF COMPLIANCE.......................................................1

CERTIFICATE OF SERVICE ...............................................................1

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Agua Caliente Band of Mission Indians v. Riverside County*,
　442 F.2d 1184 (9th Cir. 1971) (*Agua Caliente I*) ........................................passim

*Arakaki v. Hawaii*,
　314 F.3d 1091 (9th Cir. 2002) ...........................................................................21

*Arenas v. United States*,
　322 U.S. 419 (1944)...........................................................................................10

*Barona Band of Mission Indians v. Yee*,
　528 F.3d 1184 (9th Cir. 2008) ...................................................................passim

*Becherer v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
　43 F.3d 1054 (6th Cir. 1995) ...............................................................................5

*Brown v. United States*,
　32 Fed. Cl. 509 (1994) .......................................................................................49

*Cabazon Band of Mission Indians v. California*,
　37 F.3d 430 (9th Cir. 1994) ...............................................................................44

*Carcieri v. Salazar*,
　555 U.S. 379 (2009)...........................................................................................26

*CBOCSW., Inc. v. Humphries*,
　553 U.S. 442 (2008)...........................................................................................22

*Christianson v. Colt Indus. Operating Corp.*,
　486 U.S. 800 (1988)............................................................................................5

*City of Los Angeles v. County of Los Angeles*,
　147 Cal. App. 3d 952 (1983) ..............................................................................9

*Confederated Tribes of Chehalis Reservation v. Thurston County Bd.*
　*of Equalization*,
　724 F.3d 1153 (9th Cir. 2013) ....................................................................passim

iv

*Cotton Petroleum Corp. v. New Mexico*,
490 U.S. 163 (1989) .................................................................................passim

*County of Riverside v. Palm-Ramon Dev. Co.*,
63 Cal. 2d 534 (1965) ........................................................................41

*County of Yakima v. Confederated Tribes and Bands of the Yakima
Nation*,
502 U.S. 251 (1992)...........................................................................27

*Crow Tribe of Indians v. Montana*,
819 F.2d 895 (9th Cir. 1987) ......................................................44, 56

*Desert Water Agency v. United States Dep't of the Interior*,
849 F.3d 1250 (2017)........................................................................4, 18

*Eberle v. City of Anaheim*,
901 F.2d 814 (9th Cir. 1990) ...............................................................35

*Fort Mojave Tribe v. San Bernardino County*,
543 F2d. 1253 (9th Cir. 1976) .............................................22, 29, 31

*Gila River Indian Cmty. v. Waddell*,
91 F.3d 1232 (9th Cir. 1996) ................................................45, 51, 57

*Gladstone Realtors v. Village of Bellwood*,
441 U.S. 91 (1979).................................................................................38

*Helvering v. Mountain Producers Corp.*,
303 U.S. 376 (1938)......................................................................26, 35

*Hoopa Valley Tribe v. Nevins*,
881 F.2d 657 (9th Cir. 1989) ......................................................44, 45

*James v. Dravo Contracting Co.*,
302 U.S. 134 (1937)...............................................................................35

*Jesinger v. Nevada Fed. Credit Union*,
24 F.3d 1127 (9th Cir. 1994) ............................................................21

*Jonathan L. v. Sup'r Court*,
165 Cal. App. 4th 1074 (2008) ...........................................................39

*Littlefield v. U.S. Dep't of Interior*,
199 F. Supp. 3d 391 (D. Mass. 2016) ................................................................ 36

*Maraschiello v. City of Buffalo Police Dep't*,
709 F.3d 87 (2d Cir. 2013) ................................................................................... 5

*Mescalero Apache Tribe v. Jones*,
411 U.S. 145 (1973) ................................................................................... passim

*Morrison v. Barham*,
184 Cal. App. 2d 267 (1960) ............................................................................... 28

*Nevada Bank v. Sedgwick*,
104 U.S. 111 (1881) ............................................................................................ 17

*Nevada v. Hicks*,
533 U.S. 353 (2001) ............................................................................................ 17

*New Mexico v. Mescalero Apache Tribe*,
462 U.S. 324 (1983) ..................................................................................... 37, 49

*Nordlinger v. Hahn*,
505 U.S. 1 (1992) .................................................................................................. 7

*Oklahoma Tax Comm'n v. Chickasaw Nation*,
515 U.S. 450 (1995) ............................................................................... 27, 29, 52

*Palm Springs Spa, Inc. v. County of Riverside*,
18 Cal. App. 3d 372 (1971) ................................................................................ 18

*Ramah Navajo School Bd., Inc. v. Bureau of Revenue of New Mexico*,
458 U.S. 832 (1982) ............................................................................... 45, 50, 55

*Salt River Pima-Maricopa Indian Cmty. v. Arizona*,
50 F.3d 734 (9th Cir. 1995) .......................................................................... 51, 57

*Segundo v. City of Rancho Mirage*,
813 F.2d 1387 (9th Cir. 1987) ................................................................ 52, 53, 57

*Seminole Tribe of Florida v. Stranburg*,
799 F.3d 1324 (11th Cir. 2015) .............................................................. 32, 33, 52

*United States v. City of Detroit*,
355 U.S. 466 (1958) ....................................................................30, 33, 35, 42

*United States v. County of Fresno*,
429 U.S. 452 (1977) ....................................................................................42

*United States v. County of Fresno*,
50 Cal. App. 3d 633 (1975), *aff'd*, 429 U.S. 452 (1977) .............................21, 29

*United States v. Gementera*,
379 F.3d 596 (9th Cir. 2004) ......................................................................35

*United States v. Pierce*,
235 F.2d 885 (9th Cir. 1956) ......................................................................10

*United States v. Rickert*,
188 U.S. 432 (1903) ....................................................................................26

*Univ. Medical Center of So. Nevada v. Thompson*,
380 F.3d 1197 (9th Cir. 2004) ....................................................................36

*Wagnon v. Prairie Band Potawatomi Nation*,
546 U.S. 95 (2005) ...............................................................................passim

*Washington v. Confederated Tribes of the Colville Reservation*,
447 U.S. 134 (1980) ....................................................................................56

*White Mountain Apache v. Bracker*,
448 U.S. 136 (1980) .............................................................................passim

*Yavapai-Prescott Indian Tribe v. Scott*,
117 F.3d 1107 (9th Cir. 1997) .............................................................21, 31, 51

S<small>TATUTES</small>

25 U.S.C. § 415 ....................................................................................passim

25 U.S.C. § 465 ....................................................................................passim

25 U.S.C. § 479 ..........................................................................................26

25 U.S.C. § 951, *et seq.* ...............................................................................9

25 U.S.C. § 2202 ....................................................................................25, 26

25 U.S.C. § 5125 ...................................................................................25, 26

25 U.S.C. § 5129 ...........................................................................................36

Cal. Gov't Code §§ 23000 – 23027 .................................................................8

Cal. Gov't Code §§ 23001, 23003, 23004 .......................................................7

Cal. Gov't Code §§ 23003, 23004 .................................................................39

Cal. Gov't Code § 25330 ...............................................................................38

Cal. Rev. & Tax Code § 95.35(a) ............................................................18, 38

Cal. Rev. & Tax Code § 96.1...........................................................................46

Cal. Rev. & Tax Code § 103 ......................................................................7, 33

Cal. Rev. & Tax Code § 104 ............................................................................7

Cal. Rev. & Tax Code § 107 ......................................................................7, 34

Cal. Rev. & Tax Code § 107.1 .........................................................................7

Fla. Stat. § 212.031 .......................................................................................33

26 Stat. 712 (1891).........................................................................................9

39 Stat. 969 (1917).........................................................................................9

**OTHER AUTHORITIES**

25 C.F.R. § 162.017(c)..............................................................................3, 4

77 Fed. Reg. 72,440 (Dec. 5, 2012)
   (codified at 25 C.F.R. Part 162)............................................................3

Cal. Const. art. XI, § 1 ...................................................................................7

Cal. Const. art. XI, § 13 ..................................................................................6

Cal. Const. art. XIII A, § 1(a) ........................................................................7

Cal. Const. art. XIII A, § 2..............................................................................7

Cal. Const. art. XIII, § 1 .............................................................7

Cal. Const. art. XIII, § 3 .............................................................7

Fed. R. App. P. 32(a) .................................................................1

Fed. R. Civ. P. 54(b) .................................................................4

## INTRODUCTION

This appeal involves the question of whether federal law preempts application of California's possessory interest tax (PIT) on non-Indian lessees of Agua Caliente land. The district court correctly concluded that federal law does not—not expressly by statute, nor when the "state, federal, and tribal interests at stake" are evaluated under *White Mountain Apache v. Bracker*, 448 U.S. 136 (1980). The undisputed facts establish that the State's interests justify the PIT, and that the governmental services PIT revenues fund "directly benefit *all Reservation residents and visitors* and, at least indirectly, promote Reservation habitability and therefore support the Tribe's ability to extend leases on Trust Land." The court also determined that there was "no evidence that [the PIT] actually impairs Agua Caliente's ability to self-govern," and that—in fact—"the governmental services that the PIT helps fund promote the very activity being taxed—the enjoyment and use of Trust Land by non-Indian lessees and Tribe members alike."

That has been true since at least 1971, when this Court first upheld the PIT. *See Agua Caliente Band of Mission Indians v. Riverside County*, 442 F.2d 1184 (9th Cir. 1971) (*Agua Caliente I*). The Aqua Caliente Tribe alleges now essentially what it alleged then—that the PIT places the Tribe and its members at a "serious commercial disadvantage" and "diminishes the value of the trust land to the Indian." But the last forty-five years demonstrate otherwise. Since 1971, the

Agua Caliente leasing market has grown from a handful of leases covering 16 acres to over 20,000 leases involving over 4,300 acres, with a total possessory interest value in excess of $2.2 billion. As the district court concluded, "any adverse effect the PIT has on the Tribe is minimal and insufficient to tip the *Bracker* scale in favor of preemption."

The Court should affirm the district court's conclusion that federal law does not preempt the PIT.

## ISSUES PRESENTED FOR REVIEW

1. Whether 25 U.S.C. § 465 (now § 5108)—a 1934 statute authorizing the Secretary of the Interior to acquire land in trust and exempt it from state and local taxation—prevents California from taxing the possessory interests of non-Indians?

2. Whether, under *White Mountain Apache v. Bracker*, 448 U.S. 136 (1980), the undisputed evidence of the extensive governmental services the County provides to the lessees of Agua Caliente land and the State's strong interests in having governmental services funded by the non-Indians who enjoy them justify the application of the PIT, even if there are minimal adverse effects on the Tribe?

3. Whether the district court correctly concluded that the Tribal interests affected by the PIT are minimal, given undisputed evidence establishing that

the Tribe provides few governmental services to lessees of tribal land and

virtually no services to lessees of allotted land, the lack of evidence

indicating that the PIT impairs the leasing marketability of Agua Caliente

land, and the fact that the lessees pay the PIT?

4. Whether California's PIT interferes with tribal sovereignty or self-

governance, when as a matter of law, the Tribe is free to impose its own PIT,

and the PIT does not interfere with the Tribe's or its members' decisions to

lease tribal or allotted land?

## STATEMENT OF THE CASE

### A. Procedural Background

In 2012, the Secretary of the Interior amended the regulations governing the

leasing of tribal lands for residential, business, and wind and solar resource

purposes. *Notice of Final Rulemaking*, 77 Fed. Reg. 72,440 (Dec. 5, 2012)

(codified at 25 C.F.R. Part 162). Part 162 implements the leasing statute, 25 U.S.C.

§ 415, which does not address taxation. A provision in the new rule, however,

declares that States and political subdivisions cannot tax non-Indian activities on,

or interests in, leased lands. The Secretary has since explained—and this Court has

agreed—that 25 C.F.R. § 162.017(c) "has no legal effect at all" and "does not

purport to preempt any specific state taxes . . . or to alter the judge-made and

judge-administered balancing test that has governed Indian preemption cases since

3

at least 1980." *Desert Water Agency v. United States Dep't of the Interior*, 849

F.3d 1250, 1254, 1255-57 (2017).

In January of 2014, the Tribe filed suit seeking declaratory and injunctive

relief against Riverside County, its tax assessor, and its tax collector, that federal

law, as confirmed by Section 162.017, preempts the PIT with respect to the

thousands of non-Indian lessees of Agua Caliente tribal or allotted lands. The

Desert Water Agency (DWA) intervened as Defendant. A putative class and

hundreds of individual non-Indian lessees filed similar challenges seeking refunds

in State court between September 2014 and October 2017. *See Herpel, et al. v.*

*County of Riverside*, No. PSC1404764 (filed Sept. 5, 2014) (putative class action

seeking writ); *Albrecht, et al. v. County of Riverside*, No. PSC1501100 (filed Mar.

6, 2015); *Abbey, et al. v. County of Riverside*, No. RIC1719093 (filed Oct. 10,

2017) (consolidated with PSC1501100).

DWA and the County moved for Judgment on the Pleadings on July 28,

2014. The court denied that motion on February 8, 2016. Due to the procedural

posture, the court acknowledged the record was devoid of evidence from the

County regarding the services it provides and the connection between those

services and the challenged tax. Excerpts of Record (ER) 22 n.9. Contrary to the

Tribe's assertion [at 6 n.2], that decision was not the Law of the Case. Fed. R. Civ.

P. 54(b) allows any order to be revised at any time before entry of judgment, and a

court may revisit its prior decisions and correct errors while the case is pending. This is especially relevant here because the district court denied the motion based only on the Tribe's allegations but then revisited its decision on summary judgment. *See Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 817 (1988); *Maraschiello v. City of Buffalo Police Dep't*, 709 F.3d 87, 97 (2d Cir. 2013). And in any event, an argument raised only in a footnote and not raised in the statement of issues or argument section of a brief is "not properly raised before this Court." *Becherer v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 43 F.3d 1054, 1058 (6th Cir. 1995).

After conducting discovery, the parties filed cross-motions for summary judgment based on the undisputed facts. On June 15, 2017, the district court granted the County's and DWA's motions for summary judgment and denied the Tribe's cross-motion. ER 57-59. The court concluded first that 25 U.S.C. § 465 does not preempt the PIT because: (1) "section 465 unambiguously restricts its tax exemption to those lands or rights that were placed in the United States' name in trust for the Indian's benefit under the [Indian Reorganization Act] or the Act of July 28, 1955—neither of which are at issue here"; and (2) the Tribe failed to present "any evidence or argument that it, its leasing arrangement, or the Reservation was established or advanced pursuant to the IRA or the Act of July 28, 1995 to bring this case within section 465's scope." ER 38.

5

With respect to *Bracker* balancing, the County "demonstrated with ample evidence the relationship between the tax and the taxed activity—namely, non-Indian use and enjoyment of the Indian lands," ER 50, and the Court thus found that "[a]lthough the federal interests in regulating Indian leasing are strong, they must bend to the state interests here, where the tax is valid and its revenues are closely related to the substantial services provided to taxpayers and nonpayers alike." ER 51. With respect to the tribal interests involved, the court concluded: (1) "[t]he Tribe has submitted no evidence that the PIT has chilled economic development on the Reservation, prevented—legally or structurally—the Tribe from imposing its own PIT, or otherwise actually interfered with tribal governance," ER 53; and (2) "the minimal effect the PIT has on the Tribe's leasehold marketability and revenue collection, the Court concludes that any adverse effect the PIT has on the Tribe is minimal and insufficient to tip the *Bracker* scale in favor of preemption." ER 54. The Tribe's appeal followed on July 14, 2017. ER 856.1.

B.    **Statement of Relevant Facts**

1.    **California's Property Tax System**

California has always relied on property taxes assessed and collected at the local level to fund essential governmental services. Cal. Const. art. XI, § 13 ("All property in this State shall be taxed in proportion to its value, to be ascertained as

6

directed by law . . .") (1849); Cal. Const. art. XIII, § 1 (declaring "all property is taxable"). "Property" is defined to include "all matters and things, real, personal, and mixed, capable of private ownership." Cal. Rev. & Tax Code § 103. "Real property" includes the "possession of, claim to, ownership of, or right to the possession of land" and "improvements." *Id.* § 104. Some property within California is tax-exempt by virtue of governmental ownership or public or non-profit use. *See e.g.*, Cal. Const. art. XIII, § 3. Private interests in exempt land, however, are taxable as "possessory interests." *Id.* § 107.

In 1978, California voters adopted Proposition 13—the "People's Initiative to Limit Property Taxation" —which caps property taxes at 1 percent of the property's value, as assessed in the 1975-1976 tax year, and restricted annual increases to an inflation factor, not to exceed 2 percent annually. *See generally Nordlinger v. Hahn*, 505 U.S. 1 (1992); Cal. Const. art. XIII A, §§ 1(a), 2. A reassessment of the property tax can only be made (a) when ownership changes, or (b) construction is done. Cal. Const. art. XIII A, § 2. The 1% tax, as applied to possessory interests, is the "PIT." ER 29; Cal. Rev. & Tax Code § 107.1.

Counties are responsible for assessing and collecting property taxes, but otherwise lack broad powers of self-government including general taxing authority. Cal. Const. art. XI, § 1; Cal. Gov't Code §§ 23001, 23003, 23004. They are responsible for implementing state-mandated services (foster care, public

health care, jails, criminal justice and elections) and providing countywide public services and essential services for residents not receiving those services from a city or special district. *See* Cal. Gov't Code §§ 23000 – 23027.

Incorporated cities within the County, such as Cathedral City, Palm Springs, and Rancho Mirage, provide law enforcement and crime prevention, fire suppression and prevention, natural disaster planning and response, emergency medical response and transport, land use planning and zoning, building safety, local parks and open spaces, recreation, water supply, treatment and delivery, sewage collection, treatment and disposal, storm water collection and drainage, solid waste collection, recycling and disposal, local streets, sidewalks, bikeways, street lighting and traffic controls, and public transit. Joint Supplemental Excerpts of Record (SER) 57, 66, 74-75, 77-78, 99-100. Special districts, such as water, irrigation, and mosquito abatement districts, provide municipal services to a particular geographic area. SER 95, 210 ¶ 3. They are funded by property taxes and fees for services. SER 212 ¶ 9, 220-21.

The revenue generated by the 1% tax is a shared revenue source for entities that provide services within the County—including K-12 school districts, cities, county offices of education, community college districts, cities, and special districts (fire protection, cemetery, community services, parks and recreation, hospital, mosquito abatement, utilities, water, irrigation, etc.). SER 199-200, 213-

16 ¶¶ 12-25. *See e.g., City of Los Angeles v. County of Los Angeles*, 147 Cal. App. 3d 952, 956 (1983) (explaining that there is "a single local property tax" collected by the County that is "shared by local government agencies designated by the Legislature"). The allocation of property tax is governed by State laws, including Assembly Bill 8 (Chapter 282, Statutes of 1979) (AB 8), which allocate the revenues to tax rate areas (TRAs)—geographical areas within a county that contain properties all served by a unique combination of taxing jurisdictions (the county, city, and the same set of special districts and school districts). SER 102-111, 204, 212 ¶ 8.

### 2. The Agua Caliente Reservation

The Agua Caliente Indian Reservation is located within the exterior geographic boundaries of Riverside County. ER 79, 740. President Grant established the Reservation by Executive Order in 1876, ER 712, and President Hayes expanded it in 1877 to include the even-numbered sections of designated land, creating a "checkerboard" pattern of ownership. ER 79, 713. Congress directed the Secretary of the Interior to allot the Reservation to tribal members in 1891. *See* Mission Indian Relief Act of 1891 (26 Stat. 712); Act of March 2, 1917 (39 Stat. 969, 976). The Secretary failed to do so, eventually prompting Congress to enact the Agua Caliente Equalization Act of 1959, 25 U.S.C. § 951, *et seq.* As a result of equalization, the Secretary allotted more than 90 percent of the

Reservation to the Tribe's 104 members as of 1961.[1] During this same period, Congress authorized the Tribe and its members to lease lands located within the Reservation for a term of 99 years. Pub. L. 86–326, 73 Stat. 597 (Sept. 21, 1959) (codified at 25 U.S.C. § 415).

### a. The Tribe's leasing activities

Today, the Tribe has approximately 2,111 acres of trust land located within Reservation boundaries (Tribal Trust Land). ER 738. The Tribe exercises jurisdiction over Tribal Trust Land and leases out 14.75 acres of that land under four commercial leases and two residential leases. ER 380-84, 414, 703; SER 184-87. The leased properties include 24 condominium-type developments; 70 single-family detached homes under development at two different locations; a utility site at Mission Hills Country Club; a federal Post Office; and leased space for billboards. SER 162-82; ER 396-97, 409-10, 668-70.

### b. The Allottees' leasing activities

Approximately 24,000 acres of land within Reservation boundaries is "Allotted Land" held in trust for the benefit of individual members (Allottees). ER 716. The Allottees lease approximately 4,300 acres, mostly to non-Indians, under approximately 19,900 master leases, mini-master leases, subleases and sub-

---

[1] *See Arenas v. United States*, 322 U.S. 419, 422-24 (1944); *see also United States v. Pierce*, 235 F.2d 885 (9th Cir. 1956).

subleases.[2] SER 161, 190, 233. The Tribe does not review or approve leases of Allotted Land and does not receive any portion of the revenues generated by those leases. ER 385-87, 391, 671-72. The Tribe has contracted with the Bureau of Indian Affairs (BIA) to review leases of Allotted Land for compliance and recordation as a federal contractor under the Indian Self-Determination and Education Assistance Act of 1975. ER 385-87. It hires employees to perform under that contract, and federal law prohibits those employees from sharing information they obtain when reviewing leases of Allotted Land with the Tribe. ER 385-87. When an Allottee leases land to a non-Indian, the Tribe is not involved in that transaction and is not informed of the lease or its details. ER 390-91, 671-72.

The County assesses and collects the PIT from non-Indian lessees of both Tribal Trust and Allotted Land. ER 29. If a lessee fails to pay the PIT, neither the Tribe nor the Allottee is liable for payment, nor does the unpaid tax become a lien or other charge upon the trust land. ER 29; SER 156. The Tribe does not pay PIT on Tribal Trust or Allotted Land, and Allottees do not pay PIT on Tribal Trust or Allotted Land. SER 118, 123, 127, 133-34.

---

[2] The Tribe leases approximately 778 acres of allotted land from Allottees. ER 678; SER 184-87. It does not pay the PIT on those leases and does not provide any governmental services to the land. ER 687-88, 691-92, 694, 707-09.

### 3. Non-Indian lessees rely on services provided by the County and other jurisdictions

The non-Indian lessees of Tribal and Allotted Lands rely almost exclusively on the County, Palm Springs, Rancho Mirage, Cathedral City, the Palm Springs school district, and special districts for essential government services, including but not limited to fire and police protection, road maintenance, flood control, sewer, electrical service, trash, public transportation, animal control services, and vector and mosquito control. SER 50-52, 54, 57, 64-66, 217 ¶ 30, 225-31.

The Tribe provides very few governmental services to trust land. SER 687-709. With respect to Tribal Trust Lands, the Tribe provides: (1) road maintenance services on the South Palm Canyon Road right-of-way (ER 687-688); (2) flood protection services in portions of Indian and Tahquitz Canyons (although the County also provides such flood protection services to those Tribal Trust Lands) (ER 690); (3) delivery of potable water to the Trading Post at Indian Canyons (ER 691); (4) environmental permitting review services where the Tribal Trust Land is not subject to a land use agreement with a local jurisdiction and for which the Tribe collects fees to cover its provision of those services (ER 699); (5) building code enforcement services where the Tribal Trust Land is not subject to a land use agreement with a local jurisdiction, and for which the Tribe collects fees to cover its provision of those services (ER 695); (6) occupational and safety code enforcement services to Tribal Trust Land (ER 696); (7) food safety code

enforcement services to Tribal Trust Land (ER 696); and (8) in conjunction with the EPA, storm water permitting services and waste water permitting services on Tribal Trust Land. ER 693-94.

The services the Tribe provides to lessees of Allotted Land are limited to environmental review and building code enforcement services on five parcels located within unincorporated Riverside County not covered by the land use agreements that the Tribe has entered with the County and other local jurisdictions. ER 695, 699-700. The Tribe does not review leases of Allotted Land because the Tribe does not consider such review its responsibility. ER 703-06.

### 4. Property tax revenues, including the PIT, directly serve the communities that generate them

PIT revenues help fund governmental services the County and other taxing jurisdictions provide to the Reservation's residents and businesses, including the lessees of trust land. SER 220-21, 226-31. The County does not track PIT revenues separately, but it can calculate the amount of PIT revenues collected from non-Indian lessees based on TRAs. SER 25-26.

During FY 2013-14, the County collected approximately $22.8 million in PIT revenue from lessees. SER 78. Pursuant to the AB 8 formula, the County is allocated approximately $3.3 million. SER 213-14 ¶ 13. The County used this revenue to help fund fire protection, health and sanitation, road district services, and emergency services, all of which were available to non-Indian lessees of trust

13

land and the Tribe itself. SER 213-17 ¶¶ 13-16 and 30, 220-21. As just one example, from 2011-2015, the County Fire Department responded to a total of 2,392 incidents on the Reservation, with an average of 478 incidents per year. SER 71, 231. The Tribe does not provide any fire emergency services. ER 687.

The County also used PIT revenues to pay, in part, for the Sheriff's Office, corrections services, the district attorney, health and mental health services, the public defender, probation services, code enforcement services, animal services, the County Counsel's Office, the County's executive office, the Board of Supervisors, the tax assessor, the tax collector, County information technology, law enforcement, jails, and health clinics. SER 220-21, 225-30. All services were available to non-Indian lessees and the Tribe and its members. SER 217 ¶ 30, 220-22. If the PIT collected from these lessees were invalidated, the County would have an approximately $3.3 million shortfall in its budget to provide these services. SER 213-17 ¶¶ 13, 26 and 30.

AB 8 allocated to the cities of Palm Springs, Cathedral City, and Rancho Mirage approximately $4.1 million in PIT revenues collected in FY 2013-2014. SER 29, 77-78. Palm Springs, where approximately 5,427 non-Indian lessees of trust land are located, used its allocated portion of PIT revenue to provide police, fire, street maintenance and lighting, building and safety, railroad station, park maintenance, recreation and library services, and to maintain its convention center.

SER 60-66, 77. Rancho Mirage, where approximately 1,085 non-Indian lessees of trust land are located, used its allocated portion of PIT revenues to provide for public safety and police and fire protection, general government functions, as well as engineering and other services (like the public library). SER 57, 77. Cathedral City, where approximately 3,093 non-Indian lessees of trust land are located, used its allocated portion of PIT revenues to fund, in part, the fire department, for general purposes, and for the provision of general government and community services. SER 77. All services provided by the three cities were available to non-Indian lessees of trust land, as well as the Tribe and its members. SER 217 ¶ 30, 220-21. If the PIT collected from these lessees were invalidated, these cities would have an approximately $4.1 million shortfall in their budgets to provide these services. SER 29, 77-78.

AB 8 also allocated to districts with specific functions approximately $2.1 million in PIT revenues collected in fiscal year 2013-2014. SER 77-78. These special districts are the agencies that provide water (like Desert Water Agency and Coachella Valley Water District), the Riverside County Flood Control and Conservation District (Flood Control District), the Desert Regional Medical Center, the Palm Springs Cemetery District, the Coachella Valley Mosquito and Vector Control District (Vector Control District), and the Riverside County Regional Parks & Open Space District. *Id*. These services benefit Reservation lands, and

were available to non-Indian lessees of trust land, as well as the Tribe and its members. SER 60-65, 217 ¶ 30, 220-21.

For instance, the Flood Control District used PIT revenues to pay for storm sewer systems and maintenance and construction of facilities like dams, open channels, and storm drains that cover zones where trust land is located, and thus control flooding of trust land, benefiting non-Indian lessees and the Tribe alike. SER 50-51, 54. As another example, the Vector Control District provided services including mosquito and vector control and disease prevention, surveillance and monitoring of health risks, applied research, and public education. SER 43-44. The Vector Control District's services are not provided by the Tribe or the federal government, and they benefit property owners, guests, employees, and tenants including those living on trust land, who enjoy a more habitable, safer, and more desirable place to live, work, or visit. SER 44. If the PIT collected from non-Indian lessees of trust land were invalidated, these special districts would have an approximately $2.1 million shortfall in their budgets to provide these services. SER 44, 51-52, 216-17 ¶¶ 26 and 30, 220-21.

Under AB 8, the greatest portion of PIT revenue is allocated to fund education services. SER 74, 77, 99, 215 ¶ 17, 221. In FY 2013-2014, approximately $13.1 million was allocated to entities providing educational services. SER 77, 215 ¶ 17. These entities include the two school districts in Palm

16

Springs, the Desert Community College, the County Office of Education, and the Education Revenue Augmentation Fund (used to alleviate statewide education funding obligations, which received approximately $4.3 million in allocated PIT revenue). SER 77, 215 ¶ 17. The education-related services are available to all non-Indian lessees of trust land, as well as to members of the Tribe. SER 212-17 ¶¶ 9, 17, and 30. Moreover, the Tribe does not provide public education services to non-Indian lessees of trust land. ER 702. If the PIT collected from these lessees were invalidated, these educational entities would have an approximately $13.1 million shortfall in their budgets to provide these services. SER 77, 217 ¶ 30.

Similar amounts to those described above for FY 2013-14 were used by the County, the three cities, and special districts in FYs 2014-2015 and 2015-2016. SER 74-75, 99-100.

## SUMMARY OF THE ARGUMENT

The district court correctly held that federal law does not preempt application of California's PIT on non-Indian lessees of Agua Caliente land. The default rule is that California has taxing authority over non-Indians within its borders, whether they are located on- or off-reservation. *See Nevada v. Hicks*, 533 U.S. 353, 361 (2001) ("State sovereignty does not end at a reservation's border."); *see also Nevada Bank v. Sedgwick*, 104 U.S. 111 (1881) ("[A]ll subjects over which the

sovereign power of a State extends are objects of taxation."). Taxing authority is vital; without it, government cannot operate.

California has declared, "there is a significant and compelling state financial interest in the maintenance of an adequately funded system of property tax administration," substantially because 53 percent of all property revenues— including the PIT—"serve to offset the General Fund obligation to fund K–12 schools." Cal. Rev. & Tax Code § 95.35(a). Riverside County is responsible for implementing California's property tax system within its borders, an obligation that includes assessing and collecting taxes, apportioning and allocating tax revenues according to the law, and processing and defending appeals. *Id.* These obligations are burdensome, given "limitations on county revenue authority, [and] increasing county financial obligations." *Id.* In fact, counties "on average, receive 19 percent of statewide property tax revenues while they are obligated to pay an average of 73 percent of the costs of administration." *Id.*

That burden has been particularly heavy for Riverside County, which successfully defended the PIT in prior state and federal proceedings. *See Agua Caliente I*, 442 F.2d 1184; *Palm Springs Spa, Inc. v. County of Riverside*, 18 Cal. App. 3d 372 (1971). Yet a year after the Secretary of the Interior promulgated a regulation acknowledged to have "no legal effect," the County is again defending the PIT, this time in three separate proceedings. *See Desert Water Agency*, 849

F.3d at 1254. The only meaningful changes since 1971 are the extraordinary growth of the Agua Caliente leasing market and a far more complicated and constitutionally limited State property tax system.

All taxpayer-lessees indisputably benefit from the governmental services PIT revenues fund. All can attend California public schools. All are protected by County and local police, fire, and emergency services. All can drive on roads built and maintained at the County and local level, and all enjoy the provision of water, sewer, and trash services provided by local and County government. That is also true for the Tribe and its members, including with respect to myriad other services provided (flood control, mosquito abatement, social services, courts, etc.). The district court reviewed these and other undisputed facts and concluded that PIT revenues help to fund services that "directly benefit all Reservation residents and visitors and, at least indirectly, promote Reservation habitability and therefore support the Tribe's ability to extend leases on Trust Land." ER 50.  California law—which mandates that property tax revenues serve the communities that generate them—ensures that there is "intimate relationship between both the lessees' enjoyment of the Trust Land and the tax assessed, and the PIT revenues and the services rendered to the tax-paying lessees." ER 49.

Under federal law, courts must take into account federal statutes and the federal and tribal interests at stake, as well. And the district court did precisely that.

It rejected the Tribe's claim that 25 U.S.C. § 465—a 1934 statute that exempts from taxation land that is taken into trust pursuant to the Act—preempts the PIT for the simple reason the Tribe's Reservation was established by Executive Orders fifty years before Congress enacted Section 465. But even had Section 465 applied, the result would be the same. This Court recently observed that the PIT "'does not purport to tax the land as such,' which would be barred by § 465, 'but rather taxes the full cash value of the lessee's interest in it,' which is not covered by § 465." *Confederated Tribes of Chehalis Reservation v. Thurston County Bd. of Equalization*, 724 F.3d 1153, 1158 n.7 (9th Cir. 2013) (quoting *Agua Caliente I*, 442 F.2d at 1186).

The district court also considered the federal and tribal interests at stake. And while it found the "federal policy of promoting Indian welfare and economic independence" to be strong and persuasive, California's interests nonetheless "outweigh[ed] the federal interests in this case." ER 45, 51. It was similarly unpersuaded by the Tribal interests, finding "no evidence that the PIT has chilled economic development on the Reservation" or that the Tribe "would have the infrastructure and wherewithal to provide the types of public services currently provided by the County if it were only given the chance." ER 52-53. Nor was there evidence that the PIT "actually impairs Agua Caliente's ability to self-govern" or "interfere[s] at all with the Tribe's leasing process." ER 56-57. And "[t]o the extent

20

that the PIT intrudes on the Tribe's economic interests, that interference is too insignificant to [preempt the PIT]." ER 56.

The Tribe challenges the district court's decision, largely by trying to recast the PIT as a tax on "the value of leasing Indian trust lands" or an "assess[ment] on Agua Caliente Indian trust lands." *See, e.g*., Op. Br. at 1, 13. It is not. The PIT is a tax on "the private citizen's usufructuary interest in [tax exempt] land and improvements." *United States v. County of Fresno*, 50 Cal. App. 3d 633, 638 (1975), *aff'd,* 429 U.S. 452 (1977).

## STANDARD OF REVIEW

Courts review summary judgment de novo. *Jesinger v. Nevada Fed. Credit Union*, 24 F.3d 1127, 1130 (9th Cir. 1994). The parties do not contend that there are material issues of disputed facts. Accordingly, the Court must only determine whether the district court properly applied the substantive law. *Arakaki v. Hawaii*, 314 F.3d 1091, 1094 (9th Cir. 2002). The Tribe, as Appellant, has the burden of proof and "must lose if it has failed to present enough facts to sustain its case." *Yavapai-Prescott Indian Tribe v. Scott*, 117 F.3d 1107, 1112 (9th Cir. 1997).

## ARGUMENT

The district court held that federal law does not preempt California's PIT. The court properly rejected the Tribe's three major arguments, all of which the Tribe presses here—that Section 465 preempts the PIT, that the State's interests in

assessing and collecting the PIT are not justified under *Bracker*, and that the PIT infringes on tribal sovereignty. The Court should affirm the district court's decision that federal law does not preempt the PIT, as it previously held in 1971.[3]

## A. Section 465 does not preempt the PIT

The Tribe and its amici offer various arguments—several of which were not raised below—as to why Section 5 of the Indian Reorganization Act of 1934 (IRA), 25 U.S.C. § 465, preempts the PIT. None is persuasive.

### 1. Section 465 does not apply because the Agua Caliente Reservation was not acquired under that Act.

The district court correctly concluded that Section 465 did not apply because it "unambiguously restricts its tax exemption to those lands or rights that were placed in the United States' name in trust for the Indian's benefit under the IRA or the Act of July 28, 1955—neither of which are at issue here." ER 38. That conclusion is correct because the Agua Caliente Reservation was not acquired

---

[3] Because *Bracker* postdates this Court's decisions in *Agua Caliente* and *Fort Mojave Tribe v. San Bernardino County,* 543 F2d. 1253 (9th Cir. 1976), the district court concluded it abrogated *Agua Caliente* and *Fort Mojave*. SER 9-11. *Bracker*, however, does not mandate a particular result—rather, it describes the applicable interpretive approach to resolving Indian preemption cases. "Changes in interpretive approach . . . [do not] justify reexamination of well-established prior law," because principles of *stare decisis* "demand respect for precedent whether judicial methods of interpretation change or stay the same." *CBOCSW., Inc. v. Humphries*, 553 U.S. 442, 457 (2008); *cf. Confederated Tribes of Chehalis Reservation*, 724 F.3d at 1158 (observing that "[e]ven prior to *Bracker*, we applied a similar mode of analysis"). It is therefore unsurprising that the district court's *Bracker* analysis resulted in the court reaching the same conclusion that this Court reached in 1971—federal law does not preempt the PIT.

pursuant to the IRA. Rather, it was established by Executive Order of President Grant in 1876, and expanded by Executive Order of President Hayes in 1877, over fifty years *before* Congress enacted the IRA.  ER 712-13.  Because Section 465 provides that "lands or rights *acquired pursuant to this Act* . . . shall be taken in the name of the United States in trust . . . and such lands or rights shall be exempt from State and local taxation," it has no application to lands set aside decades earlier. 25 U.S.C. § 465 (emphasis added). The Tribe's arguments as to why Section 465 should apply to lands set aside by Executive Order decades before the statute existed are unpersuasive.

a.     In a footnote, the Tribe asserts [at 28 n.8] that the district court "assumed, incorrectly and without analysis, that all Agua Caliente Reservation Indian trust-lands pre-dated 1934" and suggests that remand is appropriate. The Court should reject that request. The Tribe's complaint alleges that "[t]he lands at issue are part of the Tribe's Reservation, which was established on May 15, 1876," and the "Reservation was expanded by an executive order . . . on September 29, 1877." SER 280. The undisputed facts state the same. ER 712-13, 740; SER 244. The district court stated that the Tribe had not "presented any evidence or argument that it, its leasing arrangement, or the Reservation was established or advanced pursuant to the IRA." ER 38. The Tribe's assertion that the court "simply

assumed" that its lands were not acquired pursuant to Section 465 is not correct; the court relied on the Tribe's complaint and the undisputed facts.

b.     The Tribe argues [at 18-19] in the alternative that Section 465 should apply because the Supreme Court reached that conclusion with respect to federal lands the United States leased to a tribe in *Mescalero Apache Tribe v. Jones,* 411 U.S. 145 (1973). But the facts in *Mescalero Apache* are readily distinguishable. There, the incidence of taxation fell on the tribe as lessee of federal land, not on a non-Indian lessee of trust land. The Tribe leased land from the United States Forest Service to build a ski resort. *Id*. at 146. The ski resort was developed "under the auspices of the Indian Reorganization Act of 1934," with money loaned to the Tribe by the United States under Section 10 of the Act. *Id.* The Court treated the land as tantamount to land acquired under Section 465—even though it technically was not—because "'it would have been meaningless for the United States, which already had title to the forest, to convey title to itself for the use of the Tribe.'" *Id.* at 155 n.11 (quoting Br. of Solicitor General).

The facts in this case look nothing like *Mescalero Apache.* The Agua Caliente Tribe is not leasing land *from* the United States; it is leasing land *to* private parties. The Tribe and its members are not developing land leased with loans issued by the United States under the IRA; they are leasing Tribal Trust or Allotted Land within reservation boundaries to non-Indians, who develop them

presumably with private funds. These activities do not occur under the "auspices" of the IRA. The Court in *Mescalero Apache* treated the leased Forest Services lands as Section 465 lands because the Mescalero Tribe, a Tribe organized under Section 16 of the IRA, developed the ski resort under Section 10 of the Act. *See id.* at 157 n.13. *Mescalero Apache* does not stand for the proposition that all trust land, whenever or however acquired, is to be treated as acquired under Section 465. The Tribe's claim [at 19] that Section 465 must apply or "all Indian lands acquired pursuant to treaties, executive orders, or other statutes prior to 1934 would be susceptible to state or local taxation" is entirely without merit.

c.      The Tribe contradicts its *Mesalero Apache* argument several pages later [at 27-28] by raising an argument not presented to the district court and therefore waived. The Tribe argues for the first time [at 28] that the Land Consolidation Act of 1983, 25 U.S.C. § 2202, makes Section 465's tax exemption applicable to all Indian trust lands. If *Mescalero Apache* had the effect the Tribe claims, the Land Consolidation Act would be superfluous.

In any event, Section 2202 merely extends the Secretary's authority to acquire land in trust under Section 465 to include those tribes that rejected application of the IRA in 1935. *See* 25 U.S.C. § 2202 (stating that "[t]he provisions of section 5108 of this title shall apply to all tribes notwithstanding" its inapplication to tribes voting against the IRA under 25 U.S.C. § 5125). It does not

25

convert non-IRA lands into IRA lands. To the contrary, the statute specifically disclaims any intent to "supersede any other provision of Federal law which authorizes, prohibits, or restricts the acquisition of land for Indians with respect to any specific tribe, reservation, or state(s)." *Id.*

In fact, the Supreme Court foreclosed the Tribe's argument in *Carcieri v. Salazar*, 555 U.S. 379 (2009). In response to the argument that Section 2202 made Section 465 available to tribes that were not under federal jurisdiction in 1934 when Congress passed the IRA, the Court held that "§ 2202 does not expand the power set forth in § 465," *id.* at 394, and refused to "assume that Congress repealed the plain meaning and unambiguous restrictions on the Secretary's exercise of trust authority in §§ 465 and 479." *Id.* at 395. Section 465 unambiguously limits the tax exemption to lands acquired pursuant to the IRA, and Section 2202 does not repeal that limitation.

d.     The Tribe next turns to [at 17] *United States v. Rickert,* 188 U.S. 432 (1903). That case stands for the unremarkable proposition that states cannot tax trust or allotted lands—albeit under the federal instrumentality doctrine. The Court has since overruled that doctrine in *Helvering v. Mountain Producers Corp.,* 303 U.S. 376 (1938). *See Cotton Petroleum Corp. v. New Mexico*, 490 U.S. 163, 174 (1989) (stating that the intergovernmental tax immunity "has now been 'thoroughly repudiated' by modern case law"). But the *per se* rule is that the states

26

cannot tax tribes or tribal land. *See e.g., Oklahoma Tax Comm'n v. Chickasaw Nation,* 515 U.S. 450, 458 (1995) (quoting *County of Yakima v. Confederated Tribes and Bands of the Yakima Nation*, 502 U.S. 251, 258 (1992)) ("a State is without power to tax reservation lands and reservation Indians.").

The Tribe's position seems to be that the district court's decision impermissibly construes the general rule that Indian lands cannot be taxed more narrowly than the exemption in Section 465. *See, e.g.,* Op. Br. at 26-27 (construing the district court's decision as "giving later-acquired trust lands greater tax preemption than pre-existing trust lands that already enjoyed tax preemption"). That argument, however, is based on the false assumption that Section 465 would preempt the PIT. As this Court has already observed, it would not. *See Confederated Tribes of Chehalis Reservation*, 724 F.3d 1153.

## 2. Section 465 would not preempt the PIT, even if it applied

If the leased lands had been acquired under Section 465, the exemption would still not preempt the PIT for two reasons. First, the incidence of the PIT does not fall on Indians, a prerequisite for application of Section 465's exemption. The Tribe cannot point to any statute that prohibits California from taxing non-Indian possessory interests. Second, the PIT is not a tax on tribal land or improvements.

The Tribe blurs these overarching principles, but its efforts to muddle these distinctions are unpersuasive.

### a. Section 465 prohibits taxation of lands and interests, the title to which the Secretary acquires in trust

Section 465 provides that "[t]itle to any lands or rights acquired pursuant to [this Act] shall be taken in the name of the United States in trust for the Indian tribe or individual Indian for which the land is acquired, and such lands or rights shall be exempt from State and local taxation." 25 U.S.C. § 465. Under that plain language, the lands and rights that are tax-exempt are those to which the United States has title. Title is ownership; it is not the right of possession. In fact, title and ownership are often transferred separately from possession. *See, e.g., Morrison v. Barham*, 184 Cal. App. 2d 267, 274 (1960) (describing a homestead assigned for life, and observing that the "holder of the underlying title has no right of possession or enjoyment while the homestead exists").

The interests that lessees possess are not acquired under Section 465. The *lessees* acquire rights to possess trust land by leases that the Secretary is authorized to approve under an entirely different statute—25 U.S.C. § 415. Possessory rights are not rights acquired by the Secretary; they are rights created by leases and *approved* by the Secretary. There is simply no way to construe Section 465 as covering lessees' possessory interests.

28

### b. The legal incidence of the PIT does not fall on the Tribe or Allottees

The *per se* rule against taxation does not apply here. States are "without power to tax reservation lands and reservation Indians." *Oklahoma Tax Comm'n*, 515 U.S. at 458. That rule is entirely consistent with Section 465, which preempts state taxation only after title to land is acquired by the United States.

The fair interpretation of the PIT establishes that the tax does not conflict with that prohibition. As the Supreme Court has repeatedly stated, "[t]he initial and frequently dispositive question in Indian tax cases ... is *who* bears the legal incidence of [the] tax." *Wagnon v. Prairie Band Potawatomi Nation*, 546 U.S. 95, 101 (2005) (quoting *Oklahoma Tax Comm'n*, 515 U.S. at 458). "[C]ourts seeking to determine the legal incidence of the taxation should look to the 'fair interpretation of the taxing statute as written and applied'"—which is in the first instance a question of state law. *Barona Band of Mission Indians v. Yee,* 528 F.3d 1184, 1189 (9th Cir. 2008) (citation omitted).

Many courts have construed the PIT. The uniform construction is that the PIT "assessment is against the private citizen, and it is the private citizen's usufructuary interest in the government land and improvements alone that is being taxed." *County of Fresno*, 50 Cal. App. 3d at 640 (authorizing California PIT assessments on employees using national forest land); *see also Confederated Tribes of Chehalis Reservation*, 724 F.3d at 1158 n.7; *Fort Mojave Tribe v. San*

29

*Bernardino County,* 543 F2d. 1253, 1256 (9th Cir. 1976) (stating that "the legal incidence of the [PIT] clearly falls on the lessee"); *cf. United States v. City of Detroit*, 355 U.S. 466, 471 (1958) (acknowledging the distinction between a tax "simply and forthrightly imposed on the property itself" and a tax "on the privilege of using or possessing" property and upholding the latter).

The PIT's incidence of taxation does not fall on Indians, and as a matter of established law, it is not a tax on Indian lands. The cases the Tribe cites do not alter that conclusion.

### c. The Tribe conflates these principles, but cannot cite to a case that supports its position

Although the Tribe concedes [at 29] that the legal incidence of the PIT falls on the non-Indian lessees, it tries to characterize [at 14] the PIT as taxing "the bundle of privileges that make up property ownership." For that to be true, the legal incidence of the PIT would have to fall on the owners of that "bundle of privileges"—the Tribe and the United States, as was the case with *Mescalero Apache*, 411 U.S. at 158. But the PIT does not, as the Tribe concedes. This argument contradicts their concession by ignoring the distinction between lessee and owner of land. It also ignores the substantial body of case law that refutes its position.

1. Under the Tribe's construction of ownership, no tax on non-Indians in Indian country would be permissible. But that is clearly not the law—for it would

render *Bracker* balancing superfluous. Courts have upheld a range of taxes on non-Indians using or leasing property within a tribe's bundle of privileges of ownership. For example, the Court upheld a severance tax levied on non-Indians lessees extracting oil and gas from reservation lands, *Cotton Petroleum*, 490 U.S. at 187, which extraction was surely part of "the bundle of privileges that make up property ownership." This Court upheld a sales tax assessed on a contractor's purchase of building materials for an addition to an Indian casino on trust land, despite the fact that hiring contractors to develop tribal land is a privilege of ownership. *See Barona Band,* 528 F.3d 1184. Also permissible are business transaction taxes assessed on non-Indians lessees operating permanent improvements (a hotel) on reservation land. *See Yavapai-Prescott Indian Tribe,* 117 F.3d 1107. In none of these cases did the courts construe Section 465 as applying because the legal incidence of the challenged tax fell on a non-Indian and not on Indian ownership or title.

In *Confederated Tribes of Chehalis Reservation,* this Court distinguished between a Washington State tax on improvements and California's PIT by observing that the PIT "'does not purport to tax the land as such,' which would be barred by § 465, 'but rather taxes the full cash value of the lessee's interest in it,' which is not covered by § 465." 724 F.3d at 1158 n.7. Thurston County had attempted to rely on *Fort Mojave*, *Agua Caliente*, and other cases in support of its

argument, but this Court observed that "[n]one … involved property taxes, however, *so they do not implicate § 465*." *Id.* at 1158 (emphasis added).

*Confederated Tribes of Chehalis Reservation* does not support the Tribe's argument for another reason. As the Court's decision states, although the "County recognized that § 465 exempted [trust land] from state and local taxation," the County presumed "that the structures on the land were not tax exempt, because . . . they were owned by CTGW [a joint venture] and not the Tribe." *Id.* at 1155. But "the Tribe owned an undivided 51 percent interest in" the joint venture that owned the permanent improvements for 25 years, after which ownership reverted 100% to the Tribe. *Id.* at 1154. The decision does not discuss the fact that the joint venture/taxpayer was majority-owned by the Tribe or that the Tribe had a 100% reversionary interest, but it does invoke the authority of cases holding that Indians cannot be taxed for on-reservation events. Nonetheless, because the incidence of taxation fell on an Indian-controlled joint venture located on-reservation, the Court's conclusion that Section 465 preempted the tax is fully consistent with *per se* rules regarding tribal taxation.

2.     The Tribe also relies [at 21] on *Seminole Tribe of Florida v. Stranburg*, 799 F.3d 1324 (11th Cir. 2015), but again ignores that the legal incidence of Florida's tax fell on the Tribe. *Seminole Tribe* held that Section 465 preempted Florida's tax on rental payments made by non-Indian lessees of

reservation land. *Id.* at 1342-43. The Florida Rental Tax involved is substantially different from the PIT. It provides that "every person is exercising a taxable privilege who engages in the business of renting, leasing, letting, or granting a license for the use of any real property" and that "[f]or the exercise of such privilege, a tax is levied in an amount equal to 5.8 percent of and on the total rent or license fee charged for such real property by the person charging or collecting the rental or license fee." Fla. Stat. § 212.031. Florida's Rental Tax, therefore, is a direct tax on the Tribe as the lessor of trust lands—a tax that federal law prohibits apart from Section 465. The fact that the lease shifted the economic burden of the tax to the lessee, however, cannot change the legal incidence. *See Barona Band*, 528 F.3d at 1189.

The Eleventh Circuit questioned the Ninth Circuit's interpretation of the PIT as a "tax imposed upon the use of property [as] something distinct from a tax imposed upon the property itself." 799 F.3d at 1334 (citing *City of Detroit*, 355 U.S. at 470; *Agua Caliente I*, 442 F.2d at 1186-87), but ultimately did not consider the PIT to be equivalent to Florida's Rental Tax. *Id*. at 1334.

3.      By labeling the PIT a "property tax," the Tribe seeks to obscure the fact that the PIT applies to non-Indian lessees because the property is tax-exempt. California assesses property taxes on the owner of land or rights that is not tax-exempt. Cal. Rev. & Tax Code § 103. It is only when a private party leases tax-

33

exempt land that a taxable interest arises—the private possessory interest. *See* Cal. Rev. & Tax Code § 107.

The Tribe takes language out of context from *Mescalero Apache* when claiming that the "use of permanent improvements upon land is so intimately connected with use of the land itself" that use is exempt from taxation. Op. Br. at 20 (citing 411 U.S. at 158). That is true when a state taxes a tribe. *Mescalero Apache* involved a New Mexico tax assessed *directly* on the Tribe by imposing a use tax on the purchase price of materials used to construct two lifts at a ski resort the Tribe developed under a lease of Forest Service land. 411 U.S. at 147.

The Court concluded that the compensating use tax on building materials that became permanent improvements was preempted by Section 465 because, even though the land had not been acquired in trust under the IRA, "it would have been meaningless for the United States, which already had title to the forest, to convey title to itself for the use of the Tribe." *Id.* at 158 n.11 (internal citations omitted). The Court concluded that the "use of permanent improvements upon land"—the ski lifts—"is so intimately connected with use of the land itself that an explicit provision [Section 465] relieving the latter of state tax burdens must be construed to encompass an exemption for the former," *id*. at 158, but not because any use of land, including by a non-Indian, is entitled to an exemption. In fact, the Court noted "that the Tribe has not suggested that it is immune from taxation *by*

*virtue of its status as a lessee of land owned by the Federal Government*," an argument that the Court had previously rejected. *Id.* at 158 n.11 (emphasis added) (citing *City of Detroit*, 355 U.S. 466 (upholding possessory interest tax on private lessee of federal land); *James v. Dravo Contracting Co.*, 302 U.S. 134 (1937) (upholding tax on contractor building dam for the United States); *cf. Helvering*, 303 U.S. 376 (upholding tax on profits derived from sale of oil and gas under lease with state)).

In relying on *Mescalero Apache*, the Tribe conflates: (1) the use of federal land *by an Indian tribe* under a lease with the United States with the use of trust land *by a non-Indian* under a lease with the Tribe; and (2) taxation of *an Indian tribe* leasing federal land with taxation of *non-Indians'* possessory interests under a lease of tribal land. The Tribe's reliance is based on this false equivalency.

### d. The Tribe's amici raise new arguments that should be rejected

The Court should reject arguments made by *amici* that were not raised below, nor considered by the court. *See e.g., United States v. Gementera*, 379 F.3d 596, 607-08 (9th Cir. 2004) (stating an amicus curiae generally cannot raise new arguments on appeal); *Eberle v. City of Anaheim*, 901 F.2d 814, 818 (9th Cir. 1990) (stating new arguments not raised by a party in an opening brief are waived). Their arguments also lack merit.

1.    The National Intertribal Tax Alliance (NITA) proposes [at 15-16] a novel construction of Section 465. It claims that the phrase "such lands," as used in the clause "such lands or rights shall be exempt" in Section 465, does not refer to the antecedent use of the phrase "lands and rights," as it appears in "lands and rights acquired pursuant to this Act." Rather, NITA claims that Section 465 is ambiguous because "such lands or rights shall be exempt" can refer to all trust lands however and whenever they may be acquired. NITA Br. at 15-16.

That is an implausible, ungrammatical construction of the Act. "Such lands or rights" obviously refers to the "lands or rights acquired pursuant to this Act" identified in the preceding clause. A federal district court reached an analogous conclusion in interpreting Section 19 of the IRA, which defines "Indian," to include "all persons of Indian descent who are members of any recognized Indian tribe now under Federal jurisdiction, and all persons who are descendants of *such members* who were, on June 1, 1934 . . ." *Littlefield v. U.S. Dep't of Interior*, 199 F. Supp. 3d 391 (D. Mass. 2016) (interpreting 25 U.S.C. § 5129) (emphasis added). The court explained that "[t]he second definition of 'Indian' uses the word 'such' to indicate that the 'members' to which it refers are those described in the first definition." *Id*. at 397; *see also Univ. Medical Center of So. Nevada v. Thompson*, 380 F.3d 1197, 1200-01 (9th Cir. 2004) (concluding that "such" refers to antecedent clause).

2.     The National Congress of American Indians (NCAI) argues [at 14] that the Territory Clause of the United States Constitution and federal statutes based on the Clause preempt the PIT. Apart from being waived, NCAI's argument requires this Court to ignore the Supreme Court's admonition in *Wagnon* that the "who" of a tax statute is "the initial and frequently dispositive question." 546 U.S. at 101. Instead NCAI claims [at 24] that the Court must ask whether the tax is on an interest in or income derived from land, not on whom the incidence falls. This argument is inconsistent with the Supreme Court's approach to Indian tax cases, as well as the results of myriad cases upholding taxes on non-Indians.

**B.     The district court correctly concluded that the State' interests fully justify application of the PIT under *Bracker* balancing**

The PIT is not preempted unless: (1) federal law preempts the exercise of state authority; or (2) the PIT unlawfully infringes "on the right of reservation Indians to make their own laws and be ruled by them." *Bracker*, 448 U.S. at 142-43. As the district court correctly concluded, neither is the case here. The Supreme Court has also made clear that even if the exercise of state authority "interferes or is incompatible with federal and tribal interests reflected in federal law," State interests may be "sufficient to justify the assertion of State authority." *New Mexico v. Mescalero Apache Tribe*, 462 U.S. 324, 334 (1983).

### 1. The State's interests in applying the PIT to lessees of Agua Caliente lands are very strong

Based on undisputed facts, the district court correctly concluded that the State has a strong interest in imposing the PIT. ER 51. California has declared that "there is a significant and compelling state financial interest in the maintenance of an adequately funded system of property tax administration." Cal. Rev. & Tax Code § 95.35(a). "[L]imitations on county revenue authority, increasing county financial obligations, and the shift of county property taxes to schools has created a financial disincentive for counties to adequately fund property tax administration," which could harm "the state's financial interest." *Id.* "[C]ounties are faced with critical revenue shortages and a need to provide and maintain vital public services that the public wants and needs." Cal. Gov't Code § 25330. Any circumstance that diminishes a local government's tax base "threatens its ability to bear the costs of local government and to provide services." *Gladstone Realtors v. Village of Bellwood*, 441 U.S. 91, 110-11 (1979).

And the undisputed facts establish that the County and municipalities provide myriad governmental services that directly benefit lessees. The County uses 60% of the PIT revenues it retains for specific uses, such as fire protection, health and sanitation and road districts. SER 74-75, 77-78, 99-100, 213-14 ¶¶ 13-16, 220-21. Those revenues fund the Sheriff's Office, Corrections, the District Attorney, Health and Mental Health, the Public Defender, Probation, Code

Enforcement, and Animal Services. SER 220-21, 225-31. The County services all unincorporated areas, including any portion of the Reservation and tribal trust lands located outside of city limits. SER 225-31. From 2011 to 2015, the County Fire Department responded to almost 2,400 incidents on the Reservation, providing direct services to the Reservation itself. SER 71, 231.

The County stands to lose approximately $3.3 million in PIT revenues, which "would negatively impact the County's ability to provide services that benefit the community, including those living and working on tribal land." SER 213-17 ¶¶ 13, 26, and 30. It cannot compensate for that loss. Cal. Gov't Code §§ 23003, 23004.

The County allocates PIT revenues to 350 recipient entities, pursuant to State law. SER 210 ¶¶ 2-5. Approximately 42% of the PIT revenues funds two K-12 school districts in Palm Springs, the Desert Community College, and the Riverside County Office of Education, and approximately 15.8% goes to the Education Revenue Augmentation Fund. SER 74-75, 77-78, 99-100, 215 ¶ 17. Public education is available to everyone, including Tribal members and lessees of Agua Caliente land. *See Jonathan L. v. Sup'r Court*, 165 Cal. App. 4th 1074, 1089 (2008) ("The state is responsible for educating all California children."). The Tribe does not provide public education to lessees. ER 702.

Palm Springs uses its 11% PIT share to fund police and fire departments, to support the convention center, and to provide street maintenance and lighting, building and safety, railroad station, parks maintenance, recreation and library services. SER 66. These services are available to lessees and benefit the community. SER 60-65, 217 ¶ 30. Rancho Mirage uses its 1% PIT share for public safety and police, general government, engineering, and other services, all of which benefit lessees. SER 57. Of the remaining approximately 30% of PIT revenues, most is allocated to agencies with specific functions, including the Coachella Valley Water District (4.6%), the Desert Water Agency (5.1%), flood control (2%), and the regional medical center (1.7%). SER 74-75, 77-78, 99-100. Regional parks, the public cemetery, and the mosquito and vector control also receive PIT funds. SER 215-16 ¶¶ 18-24. The government services provided benefit the Reservation, its members, and lessees. SER 213-17 ¶¶ 13, 26, 28 30. If the PIT were invalidated, those enjoying the benefits of the services would no longer pay their fair share, and services would have to be curtailed. SER 217 ¶¶ 28, 30.

The record clearly supports the district court's conclusion that the "evidence presented in this case shows an intimate relationship between both the lessees' enjoyment of the Trust Land and the tax assessed, and the PIT revenues and the services rendered to the tax-paying lessees." ER 49-54.

40

The Tribe tries unsuccessfully to undermine the court's conclusion. The Tribe attempts to recast the PIT as a tax on land—an argument that fails, as a matter of law. The Tribe next asserts that the PIT is an impermissible general revenue tax, mischaracterizing legal authority and the tax. The Tribe further argues that the cases require a closer nexus between the tax and services than what is actually necessary. Finally, the Tribe asserts that the revenues the PIT generates are not tied to any particular service, which State law and the evidence contradict. Nothing the Tribe argues undermines the State's strong interests or the district court's conclusion that those interests justify the PIT.

### a. The PIT is not a tax on Indian Land, as the Tribe repeatedly suggests

The district court correctly identified and defined the scope of the conduct being taxed, which is the mandatory first step in Indian tax preemption cases. *See Wagnon*, 546 U.S. at 102-03. The taxable event here is "the leaseholders' use and enjoyment of their interests in the land." ER 47. This conclusion was required under binding precedent. *See supra*, Sec. A.2.b.

In *Agua Caliente I*, this Court stated that the PIT "does not purport to tax the land as such, but rather taxes the 'full cash value' of the lessee's interest in it." 442 F.2d at 1186 (quoting *County of Riverside v. Palm-Ramon Dev. Co.,* 63 Cal. 2d 534 (1965)); *see also Confederated Tribes of the Chehalis Reservation,* 724 F.3d at 1158 n.7 (stating that "[w]hile the distinction between taxes imposed on non-

Indian lessees' rights of possession . . . and property taxes imposed on improvements . . . may appear formalistic, it is critical here"). The Supreme Court has reached the same conclusion. *See City of Detroit,* 355 U.S. at 470 (distinguishing between a tax that "simply and forthrightly [is] imposed on the property itself" and a tax "on the privilege of using or possessing" property and upholding the latter); *United States v. County of Fresno,* 429 U.S. 452, 464 (1977) (observing that the "'legal incidence' of the [PIT] involved in this case falls neither on the Federal Government *nor on federal property*.") (emphasis added).

This point is so well-established that the Tribe's repeated efforts to cast the PIT as "assessed and collected from Agua Caliente Indian trust lands," [at 2], so that it can argue [at 27] that "Agua Caliente Indian Trust Lands are not subject to the PIT" and [at 28] that tax immunity "preempts the PIT as applied to Agua Caliente Indian trust lands," indicate the Tribe's concern that it cannot possibly succeed when the PIT is properly construed. The PIT, as a matter of law, is a tax on private possessory interests in exempt land. It is not a tax on Indian lands; it is not a tax on the activity of leasing Indian lands; and it is not a tax on the Tribe or its members.

### b. The Tribe's argument against "general revenue taxes" misconstrues the law and the PIT

The Tribe also argues [at 47, 51] that the PIT is not justified because it is a "general revenue tax" reflecting "only a general interest in raising revenue." That

argument misconstrues the Court's decision in *Bracker*, which is distinguishable in any case.

*Bracker* involved Arizona's motor carrier license and use fuel taxes levied on an Indian contractor harvesting timber on-reservation, the purpose of which was for "partially compensating the state for the use of its highways." 448 U.S. at 137. By mutual concession, the dispute was limited to whether Arizona could tax the logging company's use of *federal roads located on-reservation* that were "built, maintained, and policed exclusively by the Federal Government, the Tribe, and its contractors." *Id.* at 150; *see id.* at 140 n.6, 148 n.14. The Court concluded that "this is not a case in which the State seeks to assess taxes in return for government functions it performs for those on whom the taxes fall," because it was evaluating the application of the State's tax only with respect to the portion of the business "conducted solely on the Fort Apache Reservation." *Id.* at 150. Because it was "unable to discern a responsibility or service that justifies the assertion of taxes imposed for on-reservation operations conducted solely on tribal and Bureau of Indian Affairs roads," the Court concluded that it did "not believe that respondent's generalized interest in raising revenue is *in this context* sufficient to permit its proposed intrusion." *Id.* (emphasis added).

From that statement, the Tribe concludes that there is a prohibition against taxes that reflect a "generalized interest in raising revenue." But that is not correct.

All taxes reflect a "generalized interest in raising revenue." *Cf. Barona*, 528 F.3d at 1192-93 ("Raising revenue to provide general government services is a legitimate state interest."). The Court's objection in *Bracker* was limited to factual context where the taxpayer received no benefit or services from the state. Here, the lessees enjoy a wide range of government services the PIT funds, which are provided on- and off-reservation. In contrast to *Bracker*, it is quite easy to "discern a responsibility or service that justifies the assertion of" the PIT. *See Bracker*, 448 U.S. at 150. Emergency services, road maintenance, flood control, and water and sewer are only a few such examples. The fact that the County has acknowledged that governmental services benefit everyone does not defeat the PIT, as the Tribe claims. *See* Op. Br. at 48. That statement simply reflects the reality that "[t]he state provides the benefits of an organized and civilized society to all of its citizens." *Cotton Petroleum*, 490 U.S. at 171 n.8 (citing district court's determination).

### c.    The law does not require the type of nexus the Tribe claims

The Tribe also argues that the challenged tax must be "'narrowly tailored" to state interests," that "'the state demonstrate a close relationship' between the tax and the interests," and that the "'tax must bear some relationship to the activity being taxed.'" Op. Br. at 33 (quoting *Crow Tribe of Indians v. Montana*, 819 F.2d 895, 901 (9th Cir. 1987); *Cabazon Band of Mission Indians v. California,* 37 F.3d 430, 435 (9th Cir. 1994); *Hoopa Valley Tribe v. Nevins,* 881 F.2d 657, 661 (9th

Cir. 1989)) (emphasis omitted).[4] The Supreme Court has rejected the narrow interpretation the Tribe articulates. In *Cotton Petroleum,* the Court clarified that the taxes in *Ramah Navajo School Bd., Inc. v. Bureau of Revenue of New Mexico*, 458 U.S. 832 (1982), and *Bracker* were preempted because "both cases involved *complete abdication or noninvolvement of the State* in the on-reservation activity." 490 U.S. at 185 (emphasis added).

This Court has since concluded that the law does not demand "a direct connection between the state sales tax revenues and the services provided." *Gila River Indian Cmty. v. Waddell*, 91 F.3d 1232, 1239 (9th Cir. 1996). While a state's interest may be strongest when "there is a nexus between the taxed activity and the government function provided," states have other strong interests, such as preventing tribes from "shopping tax exemptions to local businesses who otherwise would remit sorely needed revenue to the state." *Barona Band,* 528 F.3d at 1193. Based on undisputed facts, the district court correctly concluded that "the state services provided on the Trust Lands and funded by the PIT are sufficiently related to the taxed activity to satisfy a nexus test, if such a test exists." ER 47 n.16.

---

[4] The Tribe relies [at 51] on *Hoopa Valley Tribe,* 881 F.2d 657, but that case is analogous to *Bracker,* not this proceeding. *Hoopa Valley* found preempted California's timber yield tax assessed on timber harvested on the tribe's reservation based on the same federal timber regulations involved in *Bracker.*

### d. PIT revenues are tied to specific services and serve the communities that generate them

The Tribe also objects [at 47] that "PIT revenues are not tied to any particular service that the County provides to taxpayers" and that the County "does not specifically track how or where PIT revenues are spent, either on or off the Agua Caliente Reservation." But State law controls exactly how PIT revenues are allocated and ensures that they be spent providing services to the communities that generated them.

All property tax revenues are allocated to the TRAs that generated them by a formula established by State law. *See e.g.,* Cal. Rev. & Tax Code § 96.1 (providing that "[f]or each tax rate area, each jurisdiction shall be allocated an amount of property tax revenue equal to the amount of property tax revenue allocated pursuant to this chapter . . ."). Because State law dictates the allocation of tax revenues, the County actually can and has calculated how PIT revenues have been allocated to the 49 TRAs where lessees of trust land are located. ER 512-13. The Tribe's claim [at 47 n.15] that "the PIT is collected from 4300 acres of the Agua Caliente Indian trust lands and is spent throughout the 4,673,920 acres of Riverside County," is an overgeneralization that fails to reflect California law and ignores the undisputed facts. It should be rejected.

Two specific examples demonstrate why the Tribe is wrong. Drainage facilities built and maintained by the Riverside County Flood Control and Water

Conservation District, for example, directly benefit the Tribe. SER 51-52, 54.
Before the District was created, there had been severe flooding over the 2,700
square miles now covered by flood control facilities, but through effective
engineering, dam and channel construction, regulation, and public education,
damaging flooding is less common. SER 50. In FY 2013-2014, the Flood Control
District received an estimated $547,961 in PIT revenue from lessees, most of
which was spent to construct and maintain Zone 6 facilities that directly benefit
those lessees, as well as Allottees and the Tribe. SER 50-51, 77. PIT funds paid for
various facilities (including dams and underground storm drains) that control
flooding of Agua Caliente land, even though they are located off-Reservation. SER
51-52.

 The pest control provided by the Coachella Valley Mosquito and Vector
Control District in Riverside County serves as another example. The Vector
Control District receives $228,700 per year of PIT revenue, which it uses to protect
against the nuisance of mosquitos, fire ants, gnats and flies. SER 43. Such service
protects public health because mosquitoes and other vectors are carriers of viruses.
SER 43-44. The Tribe and federal government do not provide mosquito protection;
yet the services undoubtedly benefit Allottees, lessees, and anyone who visits the
region. SER 44.

47

Thus, the Tribe's claim [at 46-47] that PIT revenues do not benefit lessees is nonsensical. The very nature of the governmental services provided, combined with the Reservation's checkerboard pattern, make segregating services by land ownership and taxpayer status impossible. The local governments cannot maintain only those roads serving fee lands. ER 79. Providing police and emergency services only to non-Reservation lands would undermine public safety generally, but particularly on-Reservation. Other governmental services—such as public schools, courts, and libraries—are not provided directly to land but help make possessory interests in Agua Caliente land worth having. SER 27-35, 39-40. Limiting such services based on tax-status basis is infeasible.

AB 8 ensures that tax revenues directly benefit the communities that generate them. As the district court concluded, the evidence clearly refutes the Tribe's argument that "the PIT 'amounts to nothing more than a generalized interest in raising revenue' that is insufficiently tied to the on-Reservation, non-Indian activity taxed" because "the PIT here helps fund the very state services from which its payers benefit." ER 50. "[T]he state services provided on and around the Reservation directly support lessees' enjoyment of Trust Lands—the activity being taxed." ER 51.

These State interests readily justify application of the PIT, regardless of the federal and tribal interests at stake.

### 2. The strong State interests outweigh the federal and tribal interests under *Bracker*

Although the district concluded that the federal interests at stake were strong, it nonetheless determined that "the state interests outweigh the federal interests in this case." ER 51. That is all that is required to uphold the tax. *See Mescalero Apache Tribe*, 462 U.S. at 334.

The Tribe, however, asserts [at 48] that State interests are not enough to justify the PIT because there is comprehensive federal regulation of the activity being taxed. The Tribe misconstrues the activity being taxed. And although the district court concluded that federal interests in leasing "are pervasive enough to preclude the burdens of a tax, absent sufficient state interests," the court did not consider the fact that the leasing regulations do not regulate *the lessee's* use and enjoyment of land, which is the "activity" being taxed when the PIT is properly construed. ER 46. The "activity" being taxed, when the PIT is properly construed, is the private citizen's usufructuary interest in land.

The leasing regulations, however, only address the leasing process, not usufructuary rights. The Court of Federal Claims observed, "[t]he government is not required to pursue leases on allotted lands or to seek out potential lessees." *Brown v. United States*, 32 Fed. Cl. 509, 517 (1994). The Secretary does not have "responsibility to manage or administer leases once they enter into effect." *Id.* Indeed, "[f]rom the plain language of [25 U.S.C. § 415], the role of the Secretary is

49

simply confined to approval and fails to contemplate any comprehensive or on-going management responsibilities." *Id*.

The relevant question is not whether the regulations are pervasive, but whether they are pervasive with respect to the lessees' possession and use of the land. Contrasting the regulations in *Bracker* and *Ramah* illustrate the point. In *Bracker*, the "activity" being taxed was the logging company's gross receipts and fuel use in conducting harvesting on-reservation timber. *Bracker,* 448 U.S. at 145-49. The timber regulations in *Bracker* were pervasive because BIA regulated virtually all of the contractor's activities—the logging equipment that could be used, the trees and total amount to be cut, the price contractors have to pay, and even the speeds contractors could drive. *Id*. at 145-48. BIA "exercise[d] literally daily supervision over the harvesting and management of tribal timber." *Id.* at 147. The regulations involved in *Ramah* were similarly comprehensive, requiring approval of architectural and engineering agreements, subcontractor requirements, pay scales, hiring preferences, preliminary on-site inspections, and cost estimates. *Ramah*, 458 U.S. at 841. BIA directly regulated the contractor on an ongoing basis. Similarly, in *Cotton Petroleum*, the economic activity the Court analyzed to assess the level of federal and state regulation was the extraction of oil and gas, which was directly regulated by BIA. 490 U.S. at 185-88.

The cases in which this Court has adjudicated challenges to state taxation of non-Indian lessees of trust land have considered the regulation and government services related to the economic activity of the taxpayer, not formation of the leases which brought the taxpayer to trust land. *Yavapai-Prescott Indian Tribe,* 117 F.3d 1107, involved the lease of trust land to non-Indians to operate a hotel owned by the Tribe. In upholding the transaction privilege taxes on the lessee/taxpayers, based largely on the state's provision of government services to the lessees and hotel patrons, the Court accorded the lease regulations little to no weight. *Id.* at 1111. In *Gila River Indian Cmty.,* the Court upheld transaction privilege taxes collected from the non-Indian lessee of trust land in operating sporting and cultural activities. 91 F.3d at 1232. The tribe argued that the taxes should be preempted based on the "comprehensive regulatory scheme governing the leasing of Indian lands," but the Court rejected that argument in finding the taxes justified based on the state's provision of services from general tax revenues. *Id.* at 1237. And in *Salt River Pima-Maricopa Indian Cmty. v. Arizona*, the Court did not consider the lease regulations in upholding sales and rental taxes assessed on lessees because "Arizona provides most of the governmental services used by the non-Indian taxpayers." 50 F.3d 734, 736 (9th Cir. 1995).

In each of these cases, the Court's balancing of competing interests weighed the federal regulation of, tribal involvement in, and government services to the

economic activity of the taxpayer. And in each, the Court held that the state

interests outweighed tribal and federal interests, and it did not find that the federal

leasing regulations pervasively regulated the taxed activity.

While the lease regulations may be extensive, covering the mechanics of

leasing, lease extensions, their term of years, and fair lease rates, they do not

regulate lessees or the economic activity in which lessees may engage.[5]

Accordingly, the lease regulations do not reflect a significant federal or tribal

interest in the PIT because they are not pervasive in relation to the taxed activity.

*Segundo v. City of Rancho Mirage* is the only Ninth Circuit opinion finding the

lease regulations comprehensive, but that case did not involve taxation. 813 F.2d

1387 (9th Cir. 1987). It involved a city rent control ordinance that directly

conflicted with the federal regulatory requirement that the lease return fair market

value to the lessor. *Id*. at 1392-93. Within the context of lease rates, the federal

regulations are comprehensive. That is why the Court observed that "[u]nlike the

---

[5] The district court's conclusion that the federal interest in the PIT is great because the lease regulations are comprehensive is the one respect in which the district court erred. ER 42-43. The district court relied on *Segundo*, discussed in text, and *Seminole Tribe,* 799 F.3d 1324. The Florida Rental Tax in *Seminole Tribe* taxed the "privilege [of engaging] in the business of renting, leasing, . . . any real property," and the incidence of the tax fell on the Tribe under state law. 799 F.3d at 1326. In such cases, the tax is preempted *per se* and no *Bracker* analysis is necessary. *See Oklahoma Tax Comm'n,* 515 U.S. at 459; *Wagnon*, 546 U.S. at 110. Because the Eleventh Circuit erred in applying *Bracker* balancing, its entire discussion is rendered dicta. Similarly, the Court should reject the analogy between the Florida tax and the PIT and the ensuing decision of Ninth Circuit precedent, because the legal incidence of each tax is different.

field of taxation, where the laws of both the State and the Tribe may be enforced simultaneously . . . the cities' rent control ordinances would necessarily preclude enforcement of a conflicting ordinance enacted by the Tribe." *Id.* at 1393. *Segundo* does not support the Tribe's argument, and it expressly distinguishes taxes like the PIT from its purview.

## C. The PIT does not interfere with Tribal Sovereignty or Self-Governance, for *Bracker* or other purposes

The Tribe's interests do not defeat the PIT, regardless of whether they are balanced under *Bracker* or evaluated independently to determine any interference with tribal sovereignty. The district court concluded: "Given the finite number of essential services that the Tribe provides on the Trust Lands, the fact that the non-Indian lessees pay the PIT, the lack of evidence that the PIT interferes with tribal governance or economic development, and the minimal effect the PIT has on the Tribe's leasehold marketability and revenue collection, the Court concludes that any adverse effect the PIT has on the Tribe is minimal and insufficient to tip the *Bracker* scale in favor of preemption." ER 54. That decision is sound as a matter of undisputed fact and law.

With respect to *Bracker*, the Tribe argues [at 3, 43] that the district court improperly ignored the PIT's effect on the Allottees. That is not accurate. For example, the district court explained that "the governmental services that the PIT helps fund promote the very activity being taxed—the enjoyment and use of Trust

Land by non-Indian lessees and Tribe members alike." ER 57; ER 27 (defining the term "Trust Land" as both Tribal Trust and Allotted Land).

Further, the district court examined the PIT's effect on tribal interests under *Bracker* based on the evidence the *Tribe proffered*. The Tribe did not offer testimony from Allottees or non-Indian lessees of Allotted Land. It did not offer evidence indicating that the 19,900 leases of Allotted Land reflect a PIT-suppressed leasing market. It did not quantify differences between the value of leases of Allotted Land versus leases on fee land. To the contrary, the Tribe admitted that it does not possess such information, does not receive any portion of the revenue Allottees earn, and does not consider those 19,900 leases its business. ER 52 n.19, 385-87, 391, 671-72. In fact, even though the Tribe leases land directly from Allottees, it did not offer testimony regarding whether the PIT influenced its *own* decision to lease Allotted Land.

The district court obviously took the lack of evidence into account. In discussing the Tribe's claim that the PIT prevents it from imposing its own tax, the court considered the entire $22 million in PIT revenues—not just the portion attributable to the Tribe's 100 leases. ER 52. Nor did it submit evidence that it could provide services, but for the PIT. *Id.* (noting no evidence to permit inference that Tribe would have the infrastructure and wherewithal to provide the types of public services currently provided by the County). To the extent that the district

court focused primarily on leases of Tribal Trust Land, it did so because that was the only evidence that the Tribe offered.

The Tribe also claims [at 28] that the PIT infringes its sovereignty because the tax economically burdens the Tribe, and that existence of the tax prevents the Tribe from imposing its own tax. The simple answer to the interference claim is that the PIT does not compel the Tribe to do anything or stop it from any actions of self-governance that it may wish to undertake. There are no facts in the record that the Tribe cannot impose a tax or that it tried to do so and failed. To the contrary, the Tribe stated, and the Court found, that "the Tribe has *chosen* not to impose such a tax" but it "is free to impose its own tax . . . should it choose to do so." ER 52.

It is not even clear that the PIT imposes an economic burden on the Tribe. The Tribe does not directly or indirectly pay the PIT, and the tax is not passed on to the Tribe as a cost in the way that use fuel taxes were paid by the tribe in *Bracker* or the sales tax charged to the tribe's construction contractor was passed on to the tribe as part of the cost of the new school in *Ramah*. The County has no recourse against the land, or the Indian owner, if the lessor fails to pay the PIT, so the land cannot be made subject to a tax lien or other burden. ER 29; SER 156. The district court observed that the majority of leases at issue (more than 99%) involve Allotted Land leased by tribal members, not by the Tribe itself. ER 52. For those

55

leases, the Tribe is earning no revenues and providing virtually no governmental services. ER 687-88, 691-92, 694, 696, 701-709. If one presumes that invalidation of the PIT might allow the lessor to capture the value of the tax in higher rents, the increased value of rents from Allotted Land would not go to the Tribe. Even if there is assumed to be an adverse economic effect on the Tribe, the district court found that it is "'simply too indirect and too insubstantial to support [Agua Caliente]'s claim of preemption.'" ER 53 (quoting *Cotton Petroleum*, 490 U.S. at 187).[6]

The Tribe's claim [at 28] that it is economically burdened because the PIT "effectively ousts the Tribe's own tax" is foreclosed by case law. The Supreme Court has long upheld concurrent taxation by a state and a tribe. *Wagnon*, 546 U.S. at 114 ("Nor is the Nation entitled to interest balancing by virtue of its claim that the Kansas fuel tax interferes with its own motor fuel tax"); *Cotton Petroleum*, 490 U.S. at 189 ("Unless and until Congress provides otherwise, each of [state and tribe] has taxing jurisdiction over all of Cotton's leases.") (where the state assessed an 8% tax while the tribe assessed a 6% tax); *Washington v. Confederated Tribes*

---

[6] *Crow Tribe of Indians,* 819 F.2d 895, the one case to find a state tax interfered with sovereignty, was distinguished by the district court based on the lack of evidence from the Tribe to support its claim. In *Crow Tribe,* expert trial testimony showed that the extraordinarily high state tax (32.9%) adversely affected the marketability of Indian coal, thereby interfering with federal and tribal interests. *Id.* at 899-900. Here, the district court found no evidence the PIT interferes with tribal governance or economic development and that the effect of the tax on "lease marketability and revenue collection" was "minimal." ER 54.

*of the Colville Reservation,* 447 U.S. 134, 158 (1980). This Circuit has rejected challenges to state taxes for the same reason. *Gila River Indian Cmty.,* 91 F.3d at 1237 (where both the state and tribe assessed gross receipts taxes); *Salt River Pima-Maricopa Indian Cmty.,* 50 F.3d at 737 ("no conflict between concurrent taxes on non-Indians by the state and the tribe") (involving a state sales tax of 5.5% and tribal sales tax of 1%); *Segundo,* 813 F.2d at 1393 (conflict does not apply to the "field of taxation where the laws of both State and Tribe may be enforced simultaneously").

## CONCLUSION

For the foregoing reasons, the judgment of the District Court should be affirmed.

DATED: March 23, 2018

Respectfully submitted,

**PERKINS COIE LLP**

By: */s/Jennifer A. MacLean*
    Jennifer A. MacLean
    Benjamin S. Sharp
    PERKINS COIE LLP
    700 Thirteenth Street, N.W., Suite 600
    Washington, D.C. 20005-3960
    Telephone: 202.654.6200
    Facsimile: 202.654.6211
    JMacLean@perkinscoie.com
    BSharp@perkinscoie.com

    Meredith R. Weinberg
    PERKINS COIE LLP
    1201 Third Avenue, Suite 4900
    Seattle, WA 98101-3099
    Telephone: 206.359.8000
    Facsimile: 206.359.9000
    MWeinberg@perkinscoie.com

    GREGORY P. PRIAMOS
    (Bar No. 136766)
    RONAK PATEL (Bar No. 249982)
    COUNTY OF RIVERSIDE
    3960 Orange Street, Suite 500
    Riverside, California 92501
    Telephone: (951) 955-6300
    Facsimile: (951) 955-6363
    rpatel@co.riverside.ca.us

    *Attorneys for Defendants-Appellees*
    *County of Riverside, Larry W. Ward,*
    *Paul Angulo and Don Kent*

## STATEMENT OF RELATED CASES

The County is unaware of any related cases pending in this Court.

DATED: March 23, 2018        Respectfully submitted,

**PERKINS COIE LLP**

By: */s/Jennifer A. MacLean*
   Jennifer A. MacLean
   PERKINS COIE LLP
   700 Thirteenth Street, N.W.
   Suite 600
   Washington, D.C. 20005-3960
   Telephone: 202.654.6200
   Facsimile: 202.654.6211
   JMacLean@perkinscoie.com

   *Attorneys for Defendants-Appellees*
   *County of Riverside, Larry W. Ward,*
   *Paul Angulo and Don Kent*

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(a)(7)(C), I certify that:

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 13,984 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionately spaced typeface using Microsoft Word 2010 Times New Roman 14-point font.

DATED: March 23, 2018                    Respectfully submitted,

                                               **PERKINS COIE LLP**

By: */s/Jennifer A. MacLean*
    Jennifer A. MacLean
    PERKINS COIE LLP
    700 Thirteenth Street, N.W.
    Suite 600
    Washington, D.C. 20005-3960
    Telephone: 202.654.6200
    Facsimile: 202.654.6211
    JMacLean@perkinscoie.com

    *Attorneys for Defendants-Appellees*
    *County of Riverside, Larry W. Ward,*
    *Paul Angulo and Don Kent*

## CERTIFICATE OF SERVICE

I hereby certify that on March 23, 2018, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

DATED: March 23, 2018                    Respectfully submitted,

**PERKINS COIE LLP**

By: */s/Jennifer A. MacLean*
    Jennifer A. Maclean